IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RONALD L. GRIGSBY,              :
                                :
            Plaintiff,          :
                                : 1:07-CV-000785
      v.                        :
                                : Honorable Sylvia H. Rambo
                                :
PRATT & WHITNEY AMERCON,        :
INC., et al.,                   :
                                :
            Defendants          :

# M E M O R A N D U M

This case is a civil rights action brought pursuant to Title VII of the
Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., and the
Pennsylvania Human Relations Act, 43 P.S. § 951 et seq. ("PHRA"). Plaintiff
alleges that Defendants Pratt & Whitney Amercon, Inc. and Amercon International,
Inc. (collectively "Amercon") and Defendant Randy Gronda discriminated against
him because of his race. Before the court is Defendants' motion for summary
judgment.[1] (Doc. 44.) The parties have briefed the issues, and the matter is ripe for
disposition. For the reasons that follow, the court will grant Defendants' motion for
summary judgment.

---

[1] The other Defendants originally named in Plaintiff's complaint—Alfred Matarese and Jim
Putira—were dismissed by order dated February 19, 2009. (Doc. 33.)

# I.    Background[2]

## A.    Parties

_____Amercon is a manufacturing company based in Middletown, Pennsylvania that makes blades, vanes, and heat shields for turbine engines. Amercon has various departments, including a vane production line—machinist line—and a welding department. Amercon's welding department has never employed more than four welders at any one time, and often has had less than four. Defendant Randy Gronda has worked for Amercon in various capacities since February 1999, and was in charge of Amercon's vane production line from 2003 through 2004. In 2005, Gronda was promoted to his current position as Director of Operations.

Plaintiff Ronald Grigsby was first hired by Amercon on December 17, 2001 as a machinist. In October 2003, Grigsby bid on and was awarded a welder position on first shift. Grigsby was laid off as a welder in December 2003.[3]

---

[2]In *Forbes v. Twp. of Lower Merion*, 313 F.3d 144, 148–49 (3d Cir. 2002), the Third Circuit reaffirmed its supervisory rule first announced in *Vadino v. A. Valey Engineers,* 903 F.2d 253, 259 (3d Cir. 1990) that "the district courts in this circuit [must] accompany grants of summary judgment hereafter with an explanation sufficient to permit the parties and this court to understand the legal premise for the court's order." *Vadino*, 903 F.2d at 259. Here, the court will identify those facts that are subject to a genuine dispute, and cite to the record in order to highlight the precise nature of any disputed facts. The court will not cite to the record where the facts are undisputed; instead, the court will rely on the statements of material fact and admissions contained therein. (Docs. 46 & 48.) The materiality of any genuinely disputed facts will be analyzed in the discussion section below.

[3]Plaintiff's 2003 layoff is not an actionable adverse employment action in this case because no timely complaint to the Equal Employment Opportunity Commission ("EEOC") or the Pennsylvania Human Relations Commission ("PHRC") was filed concerning this action. In its May 21, 2008 memorandum and order, this court granted Defendants' motion to dismiss all of Plaintiff's Title VII claims regarding events occurring before July 20, 2004. (*See* Doc. 35.) The court recites these facts here purely for chronological purposes. Although Plaintiff recites additional facts in his counter-statement of material facts concerning the steps that he took post-layoff to be called back to work, the court finds that

(continued...)

Defendants allege that Grigsby was laid off because of a slowdown in the welding department. (Doc. 46-3 at 4, Alfred Matarese Decl. ¶ 6; *Id.* at 15, Randy Gronda Decl. ¶ 7.) Grigsby asserts that he does not know why he was laid off, and that he was not at work when it happened. (Doc. 49-2, Ronald Grigsby Dep., Vol. 1, Sept. 25, 2008 at 17.) In July 2004, Grigsby was recalled to a machinist position, and began working in that capacity on or about August 2, 2004. Grigsby worked as a machinist from August 2, 2004 until March 7, 2005, when he was awarded a welder position. During the time that he was in the welding department, Grigsby was the only African-American in welding. He stayed in welding until 2007 when he bid on and received a machinist position he currently occupies.

### B.    May 2004 decision not to add a welder

While Grigsby was laid off from his position as a welder in May of 2004, Amercon believed that it would likely need a welder in the coming months because of an expected increase in welding production needs. At the time, Amercon employed only one welder—Renee Rivera—who was working more than forty hours per week. Amercon decided to test current employees to see if any of them possessed the required welding skills. Amercon states that it chose to test only current employees because of its financial condition; it wanted to fill the position with a current employee to keep as many current employees working as possible.[4] (Doc. 46-3 at 4-5, Matarese Decl. ¶ 11.) Amercon also advertised in the Sunday,

---

[3](...continued)
these allegations are immaterial to this case because they too would not have been subject to a timely complaint to the EEOC or the PHRA. (*See id.*)

[4]Grigsby challenges this as Amercon's true motivation, but provides no citation to admissible evidence that would counter Amercon's contention.

Harrisburg Patriot-News in case any of the individuals tested could not meet the requirements. Grigsby did not see this advertisement until August 2004 when he came back from being laid off. (Doc. 49-6, Grigsby Dep., Vol. II, Sept. 26, 2008 at 276-77.) Amercon also posted the job description for the welder position on bulletin boards at the Amercon plants from May 4, 2004, through May 7, 2004.

Amercon tested four individuals for the welder job: two of whom were African-American and two of whom were Caucasian. Three of the four persons tested were current employees, the fourth was a former employee with management experience. Amercon avers that it tested the non-employee because he had skills that would benefit the company independent of the welding department, and that one of its primary customers at the time had previously worked with this individual and requested that Amercon bring him back. Grigsby was not contacted about this position. Amercon avers that at the time it did not have any formal policies related to layoffs or recalls, but considered factors such as an individual's seniority within the company, his or her skill and experience, and prior performance. (Doc. 46-3 at 4-5, Matarese Decl. ¶ 8.) Grigsby contends that Amercon did have formal policies for recall, and cites the Amercon Associate's Guide, Section 1.2 Equal Employment Performance Opportunity Policy.[5] (Doc. 49-8 at 66, Amercon Associate's Guide §

---

[5]The policy reads, in relevant part:

**1.2 Equal Employment Performance Opportunity Policy**
No one will be denied opportunities or benefits on the basis of age, sex, color, race, creed, national origin, religious persuasion, marital status, political belief, or disability that does not prohibit performance of essential job functions; nor will anyone receive special treatment for those reasons.

This policy applies to all phases of employment, including recruiting, placement,

(continued...)

1.2.)  Amercon states that in addition to wanting to give its current employees a chance to test into this position, that Grigsby was "a difficult employee to manage," an accusation that Grigsby disputes.  (Doc. 46-3 at 16, Gronda Decl. ¶ 9.) Ultimately, after testing the four individuals, Amercon decided not to hire anyone as the need for an additional welder never materialized.

### C.    Grigsby's recall in August 2004

When the need arose for more machinists, two management employees—Joel Williams and Scott Deitrich—spoke with Gronda about bringing back Grigsby.  Gronda expressed reservations about recalling Grigsby because he believed that Grigsby was difficult to manage.  (*Id.*)  Ultimately, however, Williams and Deitrich convinced Gronda to recommend that Grigsby be recalled.  In July 2004, Grigsby was recalled to Amercon to work as a machinist and began work on August 2, 2004.

### D.    Welding Certification

After he returned to work as a machinist in August 2004, Grigsby requested that Amercon pay to maintain the welding certifications he had earned prior to his layoff in December 2003.  Amercon refused to do so.  Each certification costs at least $400, and Amercon states that its decision to deny Grigsby's request was partly based on the cost of maintaining this certification for an employee who was not welding and who Amercon had no plans to return to welding position.

---

[5](...continued)
promotion, demotion, transfer, layoff, termination, associate development, compensation, benefits, associate facilities and participation in Amercon-sponsored activities.

(Doc. 49-8 at 66, Amercon Associate's Guide § 1.2.)

(Doc. 46-3 at 21-22, Matarese Decl. ¶¶21-22.)  Grigsby counters that Amercon's true motivation was that it did not want him in welding, and that Amercon maintained the certification of another non-welder—John Forry, who is white—when that employee was not working in welding, (Doc. 49 at 36, Ronald Grigsby Decl. ¶ 22); although, Grigsby acknowledges that Forry was permitted to come from the machinists line to the welding area to practice only after he had been selected to become a welder.  (Doc. 49-2, Grigsby Dep., Vol. 1, Sept. 25, 2008, at 165-167.)  It is undisputed that if Grigsby were subsequently needed in welding, he could regain his certifications in two to four weeks.

### E.    Hiring of part-time welder

In September 2004, Amercon decided that it needed to hire a part-time welder.  Amercon decided to recall James Hartman, an employee who had gone out on medical leave earlier in the year but who was cleared to come back for part-time work.  Hartman has worked for Amercon since 1999, and has decades of welding experience.  Amercon states that it did not give the job to Grigsby because doing so would have created a need for a part-time machinist and the machine line was already overstaffed.  (Matarese Decl. ¶ 18.)  The parties agree that Gronda played no role in the decision to award the position to Hartman rather than Grigsby.

### F.    Transfer to welder position and pay

In February 2005, Amercon posted a job notice for an additional welder position.  Grigsby bid on and was awarded the position.  On or about February 28, 2005, prior to transferring to welding, Grigsby received a pay increase from $14.50 per hour to $14.85 per hour.  On March 7, 2005, Grigsby started his new welding position at $14.85 per hour.  At the time, the pay range for welders was $12.30 per

hour to $18.50 per hour. Shortly after Grigsby was awarded the position, Amercon also hired John Forry, who is white, to an additional welder position. Forry's hourly rate at the time was $11.95 per hour.

It was Amercon's practice with respect to lateral internal transfers to complete a performance review of an employee after ninety days in the new position. If after ninety days, the employee's performance in the new position warranted a pay increase, the employee was rewarded with a raise. Grigsby's ninety-day review occurred in July 2005, and he received a $.75 per hour pay raise. He was unhappy with this amount and requested and received a meeting with James Pacelli, the General Manager of Amercon and the then-HR manager Patricia Baughman. Grigsby requested an additional $.25 per hour which would take him to $15.85 per hour. At this meeting, Grigsby told Pacelli for the first time that he believed that Amercon was discriminating against him based on race. At this meeting, Pacelli asked Grigsby why he believed that Amercon had discriminated against him, and in response Grigsby could not articulate any specific reason, instead he stated that "all black people know in their heart when they are not welcome, liked, and or when they are being discriminated against." (Doc. 49-9 at 64, Grigsby Diary entry.)

After the meeting with Grigsby, Pacelli investigated Grigsby's claims that he should have been awarded a welder job previously and been permitted to maintain his welder's certifications while on the machine line, and ultimately concluded from Amercon's standpoint there were legitimate business concerns for these decisions. Nonetheless, Pacelli decided to approve the additional $.25 per hour raise for Grigsby taking his pay up to $15.85 per hour; he also made this rate

retroactive to June 6, 2005—ninety days after Grigsby started in the welder position. Defendant Gronda played no role in deciding to award Grigsby the welder position or any of the issues surrounding Grigsby's pay. Although Grigsby initially filed his charge of discrimination with the EEOC in May of 2005, Amercon did not receive notice of this charge until September 2005. Thus, its decision to award Grigsby an additional $.25 per hour was made prior to any knowledge on Amercon's part that Grigsby had filed an EEOC charge.

In 2007, Grigsby was still in the welding department and bid for and was awarded a machinist position that offered more opportunities to earn overtime pay. Gronda awarded Grigsby this job.

### G. Procedural Background

On May 13, 2005, Grigsby sent a letter to the Equal Employment Opportunity Commission ("EEOC") alleging race discrimination by Defendants. The letter stated that Plaintiff wished to file a charge of race discrimination, and requested that the charge be dual-filed with the Pennsylvania Human Relations Commission ("PHRC"). On June 23, 2005, an EEOC investigator sent a letter to Plaintiff's attorney requesting that Plaintiff complete an "EEOC Charge of Discrimination Form" which the EEOC attached to Plaintiff's previously submitted Statement of Discrimination. (Doc. 16 at Ex. 9.) On November 16, 2005, the PHRC sent a letter to Plaintiff acknowledging that his charge was dual-filed with the PHRC, and that it had waived the opportunity to investigate the complaint. (*Id.* at Ex. 11.) On March 27, 2006, the EEOC made a determination that there was reason to believe that a violation of Title VII had occurred, and it stated that the EEOC would seek conciliation with the defendants. (*Id.* at Ex. 12.) The conciliation

efforts were unsuccessful, and on January 29, 2007, the EEOC mailed Plaintiff a Notice of Right to Sue.

On April 29, 2007, Plaintiff filed the instant complaint against Defendants Amercon, as well as individual defendants Alfred Matarese, Randy Gronda, and Jim Putira, alleging race discrimination and harassment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.* and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. Ann. §§ 951, *et seq.* After Defendants filed motions to dismiss, the court issued two memoranda and opinions disposing of Defendants' motions. The combined effect of the court's February 19, 2008 memorandum and order and its May 21, 2008 memorandum and order is that the scope of Plaintiff's case was narrowed significantly. All claims against individual Defendants Alfred Matarese and Jim Putira were dismissed. (Doc. 33 at order.) The only claims remaining are (1) Plaintiff's Title VII claims against Amercon arising on or after July 20, 2004; (2) Plaintiff's PHRA claims against Amercon arising on or after November 17, 2004; and (3) Plaintiff's PHRA claims against Randy Gronda arising on or after November 17, 2004. (*See* Doc. 33 at order and Doc. 35 at order.)

On November 17, 2008, Defendants filed the instant motion for summary judgment, brief in support, and statement of material facts. (Docs. 44-46.) On December 2, 2008, Plaintiff filed his brief in opposition, exhibits, and answer to statement of material facts. (Docs. 47-49.) On December 12, 2008, Plaintiff filed a motion to file a supplemental brief, which was granted by order dated December 15, 2008. On December 17, 2008, Plaintiff filed his supplement to his brief in opposition to summary judgment. (Doc. 52.) On January 2, 2009, Defendants filed

their reply brief.  (Doc. 53.)  On January 20, 2009, Plaintiff filed a motion for a hearing, which motion was denied by order dated January 21, 2009.  (Docs. 54-55.)  Defendants' motion is now ripe for disposition.

## II.      **Legal Standard**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party.  *Id.*  The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party.  *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Id.* (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted).

Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322-23. "'Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

## III.       Discussion

Title VII makes it an unlawful employment practice for an employer "to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race. . . ." 42 U.S.C. § 2000e-2. In this case, Plaintiff alleges that Defendants Amercon and Gronda discriminated against him based on his race in connection with four discrete employment decisions: (1) by not recalling him from layoff to a welder position in May 2004; (2) by not permitting him to maintain his welding certifications after he had been recalled to work and was working as a machinist; (3) by recalling another employee to be a part-time welder in September 2004 rather than Plaintiff; and (4) by not providing him with a pay increase immediately upon transferring him to a welding position in March 2005.[6] (Doc. 47, Pl.'s Br. in Opp. to Mot. for Sum. J. at 3.) Before turning to

---

[6]Plaintiff brings this claim pursuant to both Title VII and the Pennsylvania Human Relations Act. Per the court's February 18, 2008 and May 21, 2008 orders only those incidents arising on or after November 17, 2004 are still before the court. (*See* Docs. 33 and 35.) The court will address these

(continued...)

the specifics of Plaintiff's claims, however, the court must first determine the appropriate lens through which to examine the alleged discrimination.

## A.    Direct vs. indirect discrimination

Discrimination claims can be established in two ways: by direct evidence that the employer's decision was motivated by discrimination; or by indirect evidence which creates an inference of discrimination under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Here, Plaintiff argues that the *McDonnell Douglas* standard is inapplicable because Plaintiff presents evidence of direct discrimination, and can prevail in defeating summary judgment without proving all of the elements of a prima facie case.  Plaintiff asserts that the direct evidence of Defendant's discrimination is the comment by Randy Gronda to him that "they don't want you in welding."  (Doc. 49-2, Grigsby Dep., Vol. 1, Sept. 25, 2008, at 26.)

The court finds as a matter of law that this statement does not constitute evidence of direct discrimination.  Evidence of direct discrimination is evidence that "fairly can be said to directly reflect the alleged unlawful basis for the adverse employment decision."  *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 513 (1997).   Here, the court cannot say that this statement by Defendant Gronda "directly reflect[s]" an alleged unlawful bias; instead, there is an inferential leap necessary before any racial animus can be imputed to this statement.  While it is true that even circumstantial evidence can be used to demonstrate direct discrimination, the court is not

---

[6] (...continued)
claims together because "[t]he proper analysis under Title VII and the Pennsylvania Human Relations Act is identical, as Pennsylvania courts have construed the protections of the two acts interchangeably." *Weston v. Pennsylvania*, 251 F.3d 420, 426 n.3 (3d Cir. 2001) (citations omitted).

convinced that this statement can fairly be said to directly reflect an alleged unlawful bias, and Plaintiff has pointed to no circumstances that would allow a reasonable jury to conclude that this statement is circumstantial evidence of direct discrimination. Moreover, it is clear from the record in this case that Defendant Gronda had no authority to either transfer Plaintiff to the welding department or deny his transfer to that department, and the Supreme Court has determined that statements by nondecisionmakers do not suffice to satisfy direct evidence of discrimination. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 277 (1989). Accordingly, since the court finds that there is no evidence of direct discrimination, the proper focus is on the *McDonnell Douglas* burden shifting analysis.

Under *McDonnell Douglas*, Plaintiff bears the initial burden of offering evidence sufficient to "create an inference that an employment decision was based on a discriminatory criterion illegal under the act." *Maxfield v. Sinclair Int'l*, 766 F.2d 788, 791 (3d Cir. 1985). If Plaintiff establishes a prima facie case, the burden of production shifts to Defendants, who must then offer evidence that is sufficient, if believed, to support a finding that they had a legitimate, nondiscriminatory reason for the failure to recall, transfer or layoff. *Showalter v. Univ. of Pittsburgh Med. Ctr.*, 190 F.3d 231, 235 (3d Cir. 1999); *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). If Defendants satisfy this requirement, the burden of production shifts back to Plaintiff to point to some evidence that the reasons offered by Defendants were pretexts for discrimination. *Shaner v. Synthes*, 204 F.3d 494, 500-01 (3d Cir. 2000). To defeat summary judgment, Plaintiff must proffer evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons or (2) believe that an invidious discriminatory reason was more

likely than not a motivating or determinative cause of the employer's action."
*Showalter*, 190 F.3d at 235. "To discredit the employer's proffered reason, [ ] the
plaintiff cannot simply show that the employer's decisions were wrong or mistaken.
. . Rather the moving plaintiff must demonstrate such weaknesses or
implausibilities, inconsistencies, incoherencies, or contradictions in the employer's
proffered legitimate reasons for its actions that a reasonable fact-finder could find
them unworthy of credence." *Fuentes*, 32 F.3d at 765. The trial court's function on
summary judgment is to determine whether Plaintiff's evidence is insufficient "to
permit a reasonable factfinder to conclude that the [employer's] reasons are
incredible." *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1067 (3d
Cir. 1996). With this framework in mind, the court will now turn to each of the
alleged discriminatory actions.

### B.     May 2004 welder search

_____Plaintiff alleges that Amercon violated Title VII by failing to recall him
to a welder position in May 2004.[7] To assert a prima facie case of employment
discrimination under Title VII in the context of a refusal to hire/refusal to recall
Plaintiff must show: (1) that he belonged to a protected class; (2) that he applied and
was qualified for a job for which the employer was seeking applicants; (3) that,
despite his qualifications, he was rejected; and that (4) after his rejection the position

---

[7]Defendants assert two bases for the court to grant summary judgment. First, they assert that Plaintiff's claims are time-barred because the court previously decided that Plaintiff only timely-filed complaints with EEOC for events occurring subsequent to July 20, 2004, and this position was posted in May 2004. (*See* Doc. 35, Memorandum and Order.) Plaintiff counters that he did not receive notice to the position posting until August 2004, and therefore it is not time-barred. The court need not resolve whether there is a genuine issue of material fact about the timeliness of this claim because it will grant summary judgment on this claim based on Defendants' second ground, that Plaintiff failed to adduce evidence sufficient to meet his prima facie case of discrimination.

remained open and the employer continued to seek applicants from persons with his same qualifications. *McDonnell Douglas Corp.*, 411 U.S. at 802. It is apparent from the undisputed facts in this case that Plaintiff clears the first three hurdles easily. He is an African-American male, clearly qualified for the welder position, and he was not recalled to that position. It is the fourth prong that delivers the death knell to Plaintiff's claim. The undisputed facts demonstrate that Amercon did not fill the welder position it posted in May of 2004 because it determined that it no longer had a need for that position and cancelled the search.

Plaintiff argues that the fact that the position was unfilled should not matter to the court's analysis and cites two cases to support his proposition. *See Meiri v. Dacon*, 759 F.2d 989, 995-96 (2nd Cir. 1985); *Cumpiano v. Banc Santander Puerto Rico*, 902 F.2d 148 (1st Cir. 1990). These cases, however, were discharge cases rather than refusal to hire/recall cases, and are unhelpful to Plaintiff. In a discharge case, the fact that a position is not refilled is not a necessary element in prima facie case; however, it is in a failure to hire case. Although the Supreme Court recognized in *McDonnell Douglas* that the facts necessary to prove a prima facie Title VII case may vary depending on the factual situation, *McDonnell Douglas* was a refusal to hire case. The Supreme Court would not have set a standard requiring a plaintiff to demonstrate that the position remained open in a refusal to hire case if it did not want the lower courts to apply this standard in future refusal to hire cases. The court recognizes that the burden of "establishing a prima facie case of disparate treatment is not [an] onerous" one, *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981), nonetheless, Plaintiff has failed to come forward with *any* evidence in support of the last prong of the *McDonnell*

*Douglas* test, and, thus, fails to meet his burden, slight as it may be. Accordingly, the court will grant Defendants' motion for summary judgment as it relates to Plaintiff's claim that his failure to be recalled in May of 2004 violated Title VII.[8]

## C. Welding certification

After he was recalled as a machinist in August 2004, Plaintiff asserts that Defendants violated Title VII by not permitting him to retain his welding certification while they permitted a similarly situated white employee—John Forry—to train for his welding certifications despite the fact that Forry was working in a different building seven miles from the welding department. As noted above, the prima facie test imposed by *McDonnell Douglas* is a flexible one tailored to meet the specific context in which it is applied. *Sarullo*, 352 F.3d at 798 (*citing Geraci v. Moody-Tottrup Int'l, Inc.,* 82 F.3d 578, 581 (3d Cir. 1996)). In this context, where Plaintiff alleges that he did not receive a benefit of employment—his ability to maintain his welding certifications—the proper prima facie test is whether Plaintiff has (1) suffered adverse employment action; and (2) that similarly situated individuals were treated more favorably. *See id.* (using "adverse employment action" in place of the more formalized *McDonnell Douglas* test and stating that the central focus of the prima facie case is always whether the employer is treating some people less favorably than others because of, among other things, their race).

Plaintiff fails to adduce even a scintilla of evidence that he suffered adverse employment action by Amercon's refusal to allow him to maintain his

---

[8]In his brief in opposition to summary judgment, Plaintiff appears to conflate his May 2004 failure to be recalled claim with his claim that Defendants' failed to transfer him to a part-time welding position in September 2004. (*See* Doc. 47, Br. in Opp. to Mot. for Sum. J. at 9). The court will address Plaintiff's latter claim separately in Part III.D., below.

welding certifications.  In his brief, Plaintiff seems to suggest that because he requested that his certifications be maintained and Amercon refused to do so that *ipso facto* he suffered adverse employment action.  This is insufficient.  There is no evidence that Amercon's denial of his request to maintain his certifications impacted his performance review, his wages, or any other material aspect of his employment.  In his deposition, Plaintiff states that he suffered by not being permitted to retain his certifications because "when the yearly review comes around, the more skill set [sic] you have, the more things you're proficient in, the more valuable you are to the company means you get more of a chunk of money."  (Doc. 49-2, Grigsby Dep., Vol. 1, Sept. 25, 2008, at 115:12-16.)  Plaintiff has adduced no evidence to support this belief.  In fact, the only evidence concerning the importance of certifications in employment is from Defendants who attest that certifications are important only at the time Plaintiff would be using them to weld.  (*See* Matarese Decl., ¶ 23.)  Moreover, it is undisputed that Plaintiff received a raise in February 2005 shortly before he returned to the welding department.  Plaintiff has put forth no evidence suggesting that this raise would have been higher had he been permitted to retain his certifications, and there is no evidence before the court suggesting that Plaintiff suffered in the terms or conditions of his employment by not being permitted to maintain his welding certifications while he was on the machine line.  He has, thus, failed to meet his prima facie burden.  Accordingly, the court will grant Defendants' motion for summary to the extent that Plaintiff's Title VII claims are premised upon Defendants' failure to permit Plaintiff to maintain his welding certifications.[9]

---

[9]As Defendants point out, Plaintiff's claims fail for another reason: Plaintiff has brought
(continued...)

## D.  Hiring of part-time welder

_____Plaintiff also asserts that he was discriminated against because of his race when Amercon failed to consider him for a part-time welder position in September 2004.  For their part, Defendants seem to concede that Plaintiff has established a prima facie case of discrimination, and instead focus their argument on their supposed legitimate, non-discriminatory reason for offering the position to another individual.

Defendants assert that they offered the part-time position to James Hartman because he was the last welder laid off, and that offering the position to Plaintiff would have created a staffing need on the machine line.  Defendants proffer the affidavit of Alfred Matarese to support these reasons for not offering this position to Plaintiff.  (*See* Doc. 46-3 at 8-9, Matarese Decl. ¶¶ 17-18.)  This is sufficient evidence to meet their burden of coming forward with a legitimate, non-discriminatory reason.  All that is required of Defendants is that they "'clearly set forth, through the introduction of admissible evidence,' reasons for [their] actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (quoting *Burdine*, 450 U.S. at 254-55 & n. 3) (emphasis

---

[9](...continued)
forth no evidence that similarly situated employees were treated differently than he was treated.  Plaintiff points to the fact that another employee—John Forry—was permitted to work on his welding certifications while he was a machinist.  However, it is undisputed that Forry, unlike Plaintiff, was hired to be a welder at the time he was given permission to train for his welding certifications.  At the time of Plaintiff's requests, he was not on the welding line and there was no expectation that he would be in welding in the future.  It is therefore unclear how Plaintiff argues that he was similarly situated with Forry.

in original).[10]  Here, Defendants' proffered reasons, if believed by the jury, would support a finding the unlawful discrimination was not the cause of the decision not to offer Plaintiff the part-time work.  It is a rational business decision for Defendants to have not wanted to disrupt work that Plaintiff was performing on the machine line.

Plaintiff attempts to rebut this reason by simply stating that he could have worked eight hours on the machine line and then worked four hours in welding each day, and, thus, Defendants had no reason not to ask him to take the part-time welding position.  While Plaintiff's solution may also be rational, it is not enough for him to demonstrate that it could have worked for him to have taken the part-time work in addition to his then-current position as a machinist.  Rather, Plaintiff must produce sufficient evidence to allow a reasonable fact finder to conclude that the proffered reasons for not hiring him to this part-time position were mere pretexts for illegal discrimination.  *See Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 413 (3d Cir. 1999).  He may meet this burden and defeat a motion for summary judgment by providing evidence that would allow a fact finder reasonably to "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not the motivating or determinative cause of the employer's action." *Id.* (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994); *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1067 (3d Cir. 1996)).  Plaintiff can accomplish this by showing that Defendants' proffered reasons are weak, incoherent, implausible, or so inconsistent that "a reasonable

---

[10]Within the *McDonnell Douglas* burden-shifting framework, the defendant only has the burden of production because the burden of proof in a discrimination claim remains with the plaintiff. *Burdine*, 450 U.S. at 253.

factfinder could rationally find them unworthy of credence." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108-09 (3d Cir. 1997). He can also meet this burden with evidence that "the employer's articulated reason was not merely wrong, but that it was 'so plainly wrong that it could not have been the employer's real reason.'" *Jones*, 198 F.3d at 413 (quoting *Keller*, 130 F.3d at 1109).

Here, Plaintiff has not produced sufficient evidence to refute Defendants' explanation of why he was not hired to the part-time position. His proposal that he could have adequately performed both jobs does not mean that Defendants' decision was unworthy of credence. Furthermore, the fact that Plaintiff believes that he was a better welder than the individual hired does not, assuming its truth, in and of itself mean that Defendants' decision not to offer him the position was weak, incoherent, or implausible. *See Keller*, 130 F.3d at 1108-09. Plaintiff has proffered no reason that would lead a reasonable jury to conclude that invidious discrimination was more likely than not the real reason Defendants chose not to offer the part-time welder position to him, and, thus, he fails to defeat Defendants' motion for summary judgment on this issue.

### E.    Pay claims

Finally, Plaintiff asserts that Amercon discriminated against him because of his race when it failed to provide him with an immediate wage increase when he was awarded the welder position in March 2005. It is difficult for the court to see the basis of Plaintiff's claim from the vagueness of his pleadings and brief; however, from what the court can glean, Plaintiff complains that he was not paid enough and that he was not paid a higher rate immediately upon being transferred. The court will review this claim under the same standard used above. Therefore,

Plaintiff must establish that Defendants' proffered reasons were weak, incoherent, implausible. *See Keller*, 130 F.3d at 1108-09. For the reasons that follow, Plaintiff's claims fail as a matter of law.

Assuming that Plaintiff can establish a prima facie case—something Defendants do not concede, but which the court will assume for the sake of argument—Plaintiff has failed to come forward with any evidence that Defendants' proffered reasons for the amount of his pay and its timing were pretextual. It is undisputed that the pay range for welders at the time Plaintiff transferred to the welding department was $12.30 per hour to $18.50 per hour. Furthermore, it is undisputed that Plaintiff was making $14.85 per hour at the time of his transfer. At that time, there were two other welders paid more highly than he was, and one welder, who transferred at the same time as he did, who was paid less than he was. Defendants assert that it is Amercon's policy for there to be a ninety-day probationary period for internal transfers where a transferee's pay remains what it was prior to the transfer so that the company can evaluate performance and adjust pay accordingly. In Plaintiff's case, after this ninety-day period he was awarded $.75 per hour raise. After he objected that this amount was insufficient, he was awarded an additional $.25 per hour raise bringing his pay to $15.85 per hour.

Plaintiff has shown no evidence that Amercon paid him less than any of the other welders based on anything other than experience. Both of the other two welders who were paid a higher hourly rate than Plaintiff had more experience and/or were certified to weld more parts. These are legitimate, nondiscriminatory criteria upon which to base a rate of pay. Furthermore, Plaintiff received his raise consistent with a neutral company policy requiring a ninety-day review period.

There is no evidence before the court that Plaintiff was subjected to this waiting period whereas others were not, or that the policy was anything other than an across-the-board decision by Amercon. There is simply nothing in the record from which a reasonable jury could conclude that invidious discrimination was more likely than not the real reason Defendants chose to pay Plaintiff $15.85 per hour and only award him that rate after a ninety-day review period, or that Defendants proffered reasons were weak, incoherent, implausible, or so inconsistent that "a reasonable factfinder could rationally find them unworthy of credence." *Keller*, 130 F.3d at 1108-09. Accordingly, Plaintiff fails to defeat Defendant's motion for summary judgment on this issue, and the court will grant Defendants' motion for summary judgment as to Plaintiff's Title VII and PHRA claims.

## IV.      <u>Conclusion</u>

Consistent with the foregoing, the court will grant Defendants' motion for summary judgment. (Doc. 44.) The court will issue an appropriate order.

<u>S/Sylvia H. Rambo</u>
United States District Judge

Dated: September 15, 2009.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**RONALD L. GRIGSBY,**               :
                                     :
    **Plaintiff,**                    :
                                     : **1:07-CV-000785**
    **v.**                           :
                                     : **Honorable Sylvia H. Rambo**
                                     :
**PRATT & WHITNEY AMERCON,**         :
**INC., et al.,**                    :
                                     :
    **Defendants**                   :

# O R D E R

In accordance with the accompanying memorandum of law, **IT IS**

**HEREBY ORDERED THAT:**

    (1)    Defendants' motion for summary judgment, (Doc. 44), is

**GRANTED**;

    (2)    The clerk of court shall grant judgment to Defendants and against

Plaintiff, and close the case.

                       S/Sylvia H. Rambo
                       United States District Judge

Dated:  September 15, 2009.